EARLE J. TEAS v. MINNEAPOLIS STREET RAILWAY
COMPANY.
LaVERNE WALKER v. MINNEAPOLIS STREET
RAILWAY COMPANY AND ANOTHER.[1]

April 29, 1955.

Nos. 36,492, 36,493.

[1]Reported in 70 N. W. (2d) 358.

*Cronan, Barto, Roseen, Welsh & Castor* and *David K. Wendel,* for appellant.

*King & MacGregor,* for respondent Teas.

*Hvass, Weisman, Peterson, King & Schwappach,* for respondent Walker.

KNUTSON, JUSTICE.

This case arises out of a collision between a streetcar owned and operated by Minneapolis Street Railway Company, referred to hereinafter as the streetcar company, and an automobile owned and driven by Earle J. Teas on November 24, 1951, at about 12:45 p. m. The collision occurred on Fourth street southeast, in the city of Minneapolis, which runs east and west, between Eighteenth avenue southeast and Nineteenth avenue southeast, both of which run north and south and intersect Fourth street southeast at right angles. Nineteenth avenue lies to the east of Eighteenth avenue. The day was clear, and the pavement was dry. Fourth street is 40 feet wide from curb to curb. There are two sets of streetcar tracks near the center of the street, the southerly pair being used by eastbound cars and the northerly pair by westbound cars. South of the southernmost curb is a six-foot boulevard and south of that a six-foot sidewalk. The curb is about 12 or 13 feet from the most southerly track.

The University of Minnesota football stadium is located about two blocks south and east of the place of the accident. On the Saturday involved, a football game was to be played in the stadium. Immediately prior to the accident, Earle Teas, driving his car and accompanied by his wife, entered Fourth street some blocks to the west of the scene of the accident. As he approached Eighteenth avenue he was followed by the streetcar involved at a distance of from five to ten feet. Because of the congestion of traffic it was necessary for vehicles to travel close together. Both automobile and streetcar were proceeding slowly. The streetcar stopped before crossing Eighteenth avenue to permit a passenger to disembark and then proceeded again easterly. It then followed the Teas car at a distance of about 20 to

25 feet for about three-quarters of the distance through the block. Both were proceeding at a speed of from 10 to 15 miles per hour.

On days when there are football games in the stadium many of the residents living near furnish parking facilities in their driveways and yards for automobiles. They frequently stand in or near their yards and on the boulevards and solicit such business by waving their arms beckoning to the automobiles to drive into their yards. The residence in which plaintiff LaVerne Walker lives is the next to the last house from Nineteenth avenue in the block between Eighteenth and Nineteenth. There is a driveway going across through the boulevard at the entrance to his house, and about four or five feet farther east is another driveway serving the last house in the block, leaving a small grass boulevard about four or five feet wide between the two driveways. On the day involved, Walker was standing on the boulevard waving his arms beckoning automobiles to enter his driveway and park therein and the witness Fuller was standing nearby directing buses into the other driveway.

As Teas approached these driveways he was looking for a place to park. The testimony of the witnesses differs as to what then transpired. Teas and his wife testified that, as they approached the Walker driveway, they slowed up and came to a stop, with their car turned toward the driveway; that they inquired of Walker what the charge was for parking; and that, while they stood still or after they had moved a few inches, they were hit in the rear by the streetcar. Teas said that, after talking to Walker, he put the car in gear and then for the first time put his turning signal lights on. His testimony in that regard is as follows:

"Q. At the time when you were engaging in this conversation, somebody in your car, was your car moving or was your car stopped?

"A. I would say the car was stopped during that conversation.

\* \* \* \* \*

"Q. All right, now, at any time prior to the impact, Mr. Teas, did you have your signal lights on?

"A. Yes, I stopped and we were waved through, and before putting the car into gear to go into the driveway, I put the signal lights on.

"Q. Before you had this conversation with Mr. Walker you had no turn lights on, but as you started to pull in you then turned your signal lights on?

"A. Yes."

Teas did not see or hear the streetcar before the impact. He explained his failure to see the streetcar in his rear view mirror as follows:

"Q. You did have the ordinary rear view mirror?

"A. Yes, sir.

"Q. I take it never having seen this car, that you never looked in the rear view mirror at any time between the time you slowed down and this conversation was had up to the moment of collision; that's true, is it not?

"A. That's wrong, sir. I looked into the mirror.

"Q. What did you see when you looked into the mirror?

"A. The car was at an angle; I couldn't see.

"Q. You couldn't see?

"A. Couldn't see the street car behind me; I presumed there was none."

The motorman on the streetcar, on the other hand, testified that, as they were proceeding easterly at about 20 to 25 feet apart, he observed the Teas car slow down and that he did likewise. He said that the automobile never came to a stop but turned in a southeasterly direction. He saw no turning signal or brake light on the car. He required 20 to 22 feet in which to stop, and, when the automobile turned to go into the driveway, he failed by one foot to bring his streetcar to a stop.

When the streetcar collided with the automobile it pushed it in a southeasterly direction over the curb, where it struck Walker. It then bounced back against the streetcar.

An action was brought by Walker against the streetcar company and Teas for personal injuries. Teas sued the streetcar company

for his personal injuries and damage to his automobile. The cases were consolidated for trial. At the close of the testimony the trial court granted the motions of Walker and Teas for directed verdicts against the streetcar company on the question of negligence. The jury found in favor of Teas and returned verdicts in favor of both Walker and Teas against the streetcar company. The streetcar company appeals from the judgments entered pursuant thereto. There has been no motion for a new trial. The only question for our determination is whether the court erred in directing a verdict against the streetcar company.

■ Respondents contend that appellant did not object to the court's order directing a verdict and, having made no motion for a new trial, may not now raise the question here. We do not agree with the contention that appellant took no exception to the court's action. The record shows that the matter was discussed by the court and counsel in chambers. The court then said:

"We have already discussed the matter, as counsel has indicated, and the plaintiff's motion for a directed verdict against the Street Railway Company as to liability will be granted, and an exception may be noted. The only matter in that case that will be submitted, as far as between the plaintiff and Minneapolis Street Railway Company, will be the matter of damages."

Thereafter further motions were made, and the court then said:

"Well, the motions of the defendant Teas in the La Verne Walker case and the plaintiff Teas in the second case will be denied, and an exception may be noted. An exception may be noted to the granting of the motion of the plaintiff in the La Verne Walker case."

The court thereafter instructed the jury to find the streetcar company negligent. No further exception or objection was taken.

Respondents seek to invoke the rule applicable to instructions to the jury on questions of law. An order granting a motion to direct a verdict is not an instruction on a question of law. It is final as far as the defendant against whom it operates is concerned. The purpose of an objection or exception is to advise the court of the rea-

sons for opposition to the action which the court has taken in order that it may have an opportunity of avoiding error. Where, as here, the parties discuss a motion for a directed verdict with the court, after which the court grants the motion and advises counsel that they have an exception to the court's action, no further objection is required. It is difficult to see what good any further objection could do.

Respondents argue that the court gratuitously granted an exception but that the losing party may not take advantage of it. We do not so lightly appraise the action of the trial court. When it appears from the record that the trial court has protected the rights of the parties by a statement that they may have an exception, the parties ought to be permitted to rely upon the court's action. Possibly this practice is not to be commended, but under these circumstances it would be entirely unfair to hold that, after the parties had relied on such action of the trial court, they were precluded from presenting the question here because they did not thereafter again object to the court's action.

■ The only serious question before us is whether the court erred in granting the motions to direct verdicts against the streetcar company. In determining this question it is elementary that the evidence must be viewed in the light most favorable to the streetcar company; also that where reasonable men might draw different inferences or conclusions from proved facts the matter in issue must be submitted to the jury.

We recently had occasion to consider the correlative rights and duties of operators of vehicles following each other. In Ryan v. Griffin, 241 Minn. 91, 94, 62 N. W. (2d) 504, 507, we said:

"* * * There are reciprocal duties on the part of the driver of a leading automobile and the driver of the car following. Each must exercise due care, must keep his vehicle under reasonable control, must drive at a speed which is reasonable and proper under the circumstances, must give due regard to the rights of the other, and in general must so operate his automobile as to avoid unnecessary collision with the other. The driver of a leading automobile has no

absolute legal right superior to the driver of the car following. The leading driver must exercise due care not to swerve, slow up, or stop without adequate warning of his intention to do so to the driver of the car following. The driver of the car following must exercise due care to avoid collision with the leading automobile. Just how close an automobile may be followed and what precautions a driver must take in the exercise of due care to avoid colliding with the automobile ahead and just what warnings the driver of the leading automobile must give in the exercise of due care before swerving, slowing up, or stopping cannot be stated in a fixed rule. In each case, except where reasonable minds may not differ, what due care requires and whether it has been exercised is for the jury."

What we said there about automobiles applies equally as well to streetcars following automobiles.

M. S. A. 169.19, subd. 1(1),[2] requires the driver of a vehicle intending to turn right to make such turn as close as practicable to the right-hand curb or edge of the roadway. Subds. 4, 5, and 6[3] state the rules for turning, stopping, or slowing up. Prior to 1947 the statute

[2]The driver of a vehicle intending to turn at an intersection shall do so as follows:

"(1) Both the approach for a right turn and a right turn shall be made as close as practicable to the right-hand curb or edge of the roadway;"

[3]Subd. 4. "No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in this section, or turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left upon a highway unless and until the movement can be made with reasonable safety, and then only after giving a clearly audible warning by sounding the horn if any pedestrian may be affected by the movement or after giving an appropriate signal in the manner hereinafter provided in the event any other vehicle may be affected by the movement."

Subd. 5. "A signal of intention to turn right or left shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning."

Subd. 6. "No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear unless there is a good and sufficient reason for not being able to do so."

required no signal for a right turn. The statute was amended by L. 1947, c. 428, § 16, so as to require a signal for either a right or left turn. The signal must be given for the last 100 feet before the turn. Streetcars are entitled to the benefits of these safeguards. § 169.03.

No one contends that the statutory signal for a right turn was given by Teas in this case. He claims that he gave a turn signal after he had stopped his car when his car already was at an angle, as is shown by the portion of the testimony quoted above. At that time his car was at such an angle that he could not see the approaching streetcar through his rear view mirror. The motorman saw no turning signal. It is entirely possible that the turn signal was not readily discernible on account of the angle at which the automobile stood at that time for the same reason that the streetcar was unseen in the mirror.

The jury could have concluded that, if the required signal had been given, the streetcar would have stopped in ample time and the collision would have been averted. It is also possible that the jury might have found that, had the Teas car been driven nearer the curb, the accident would not have occurred. There was no other traffic on the street. There was ample room to drive the Teas car completely off the streetcar tracks. While the court properly instructed the jury on the statutory requirements in determining whether Teas was negligent, these statutes apply equally as well in determining whether the operator of the streetcar was negligent. Failure to give the required signals well might lead the jury to conclude that the operator of the streetcar did not have sufficient opportunity to stop. The car following a lead car ordinarily would have a right to assume that the statutory signals would be given before any turn was made by the lead car, and, while failure to give such signal does not relieve the operator of the following car from exercising due care, it may furnish justification for conduct which otherwise would be inexcusable. These are all questions for the jury to determine.

While the question is a close one, it is only in the clearest of cases that the question of negligence becomes one of law. We believe

that the evidence here is such that the question of negligence of the streetcar company was one of fact for the jury's determination and that it was error to direct the jury to return a verdict against the streetcar company on this issue. The rights of the parties are so interwoven that the new trial should be on all issues.

Reversed and new trial granted.